Charles T. Major, J.
This is a claim for damages due to the alleged negligence of the State and set forth in two causes of action, viz:
(a) Assault on claimant, June Meredith McCandless, an inmate of Pilgrim State Hospital, by another inmate, resulting in claimant’s pregnancy;
(b) The performance of an abortion on claimant to terminate the pregnancy.
June Meredith McCandless was born on September 19, 1931, grew up a normal girl, in good health, physically and mentally, and resided with her parents and older sister, Virginia, until about the middle of 1948. She was then 17 years of age and in the third year of high school. Because of certain incidents, claimant was taken to the New York Psychiatric Institute on February 1, 1949. After showing improvement, she was discharged on June 13,1949, remained home about a year, and was then taken to Kings County Hospital. Later, by a court order, she was committed to a State hospital and transferred to Pilgrim State Hospital. After several months and commencing about June, 1951, she was permitted to leave the hospital on the bi-weekly visiting day (Wednesday), from 11:00 a.m. to 4:00 p.m., but only in the custody of her parents. On such occasions, claimant was never out of the sight of one or both parents.
After a lobotomy operation was performed on claimant on April 22, 1952, these out-of-hospital trips were suspended for about two months and resumed again about June. After the operation, claimant gave indications of improvement until sometime in October or November of the same year. From then on, she appeared to regress slowly, became nauseated and did not feel well. On Christmas Day, claimant was permitted to go home with her parents from 10:00 a.m. to 4:00 p.m. She was returned to the hospital within the allotted time, after having a pleasant day.
On visiting the hospital on January 7,1953, claimant’s parents were told by the psychiatrist in charge of claimant’s ward, to go to the assistant director’s office for a conference. At this conference with the director and the assistant director of the hospital, claimant’s parents were informed that their daughter was about four and one-half to five months ’ pregnant. The conference recessed and, upon reconvening in the afternoon, the report of the hospital officials’ investigation showed that claimant had sexual intercourse in the hospital with a male inmate thereof, whose last name was Colletti. The incident occurred during a dance when claimant and Colletti left the dance floor *393 through an unlocked and unguarded door, went up a few steps to an empty 8 feet by 10 feet hallway, where they had carnal relations, and then returned to the dance. Their departure from the dance hall, their absence, and their return were not observed or known to those in charge of the dance. It was known, or should have been known, that Colletti was claimant’s “ boy friend ”, that sex was a factor in claimant’s illness and Colletti had given her candy, and their affection was apparent. These dances were associated with the recreation program and were a proper part of the therapy treatment. However, such events must be properly supervised by an adequate number of competent hospital personnel. In the operation and management of its" hospitals, the State is responsible for hazards reasonably to be foreseen and for risks reasonably to be perceived. (Williams v. State of New York, 308 N. Y. 548.) The escape of these two inmates through an unlocked and unguarded door to the vacant hallway should have been foreseen, and the risk of such venture should have been perceived. The care and supervision provided at this particular event in which claimant became involved was insufficient and inadequate. Either there were not enough attendants, or the attendants were lax, careless and negligent in the performance of their duties. The court finds that the State was negligent under the first cause of action.
Because of the State’s negligence, claimant was assaulted, her privacy invaded and trespassed upon, resulting in her pregnancy. After this, her condition commenced to regress, the improvement gained after the lobotomy operation diminished, she suffered the usual pains, nausea and ill health physically. Her spirits became lower and she acted worried. This condition continued for the four and one-half to five months and until an abortion operation was performed on January 8, 1953. The pregnancy was discovered by the hospital psychiatrist on January 7, 1953; and the director of the hospital, on being informed that day of claimant’s pregnancy, admittedly became under a great strain, upset and disturbed. After his conference with claimant’s parents and informing them of the situation, he told the parents that they could visit their daughter any day they wished without waiting for the regular bi-weekly visiting day. Nothing was said about an operation or abortion. After the departure of claimant’s parents, the director of the hospital held a conference with his assistant director and the psychiatrist in charge of the acute medical-surgical building. They decided to perform an operation called by one doctor an “ interruption of pregnancy”; by another a ‘ ‘ therapeutic abortion ”, but referred to herein by this court as an abortion. Each of the *394 three doctors signed a statement giving as a reason for such action that “ continuation of pregnancy will threaten the improvement shown and will undoubtedly revive the homicidal and suicidal trends ”, The evidence does not substantiate this conclusion, and the general facts and circumstances do not establish the necessity.
These hospital doctors certainly knew of the potential criticism against the institution and its administrators as a result of this incident, and such a conference, if held at all, should have been carried on by physicians and/or psychiatrists whose only concern was the life of the patient. In any event, this conference or commission, according to their joint statement, did not come to the conclusion necessary to legally- justify the abortion.
A therapeutic abortion is the only abortion condoned in this State. (Matter of Investigation, etc., Kings County, 286 App. Div. 270.) A “ therapeutic abortion ” is one artifieally induced in order to save a life. (Matter of Investigation, etc., Kings County, supra.) The abortion involved in this claim was artificially induced, but was not to save a life and was, therefore, not a “therapeutic abortion ”, Even consent on the part of claimant or her parents would not legalize, justify or permit it. Only God had the power over the life of this unborn child. Claimant displayed no tendency or indication of suicide or homicide from this pregnancy, and there was no emergency. When claimant’s parents returned to the hospital on January 14, 1953, they brought maternity clothes which they had purchased for their daughter. On arriving at claimant’s ward, they were sent to the infirmary and were told by the doctor who administered a spinal anesthesia for the abortion, that on a re-examination of claimant, a cyst was discovered which called for an immediate operation. Such was not the fact. The initial steps were performed by a doctor who is on the hospital’s consulting staff, makes regular visits to the hospital and serves on special cases. This operation was dangerous and required special skill, particularly so because claimant was suffering from inflammation of the cervix at the time thereof. The operation was performed by the use of surgical instruments being passed into the uterus and by packing the canal of the cervix. This was done on January 8, 1953. The placenta was passed on January 13, under the attention of the psychiatrist in charge of the acute medical-surgical building. In the interim, claimant was confined to bed in the infirmary and at times ran a fever which reached a high of 104 degrees. The fever was caused by a toxic substance from the dead fetus remaining in *395 the body after labor was induced, Claimant endured considerable physical pain and suffering and mental anguish. The performance of this abortion operation is based on neither right nor justifiable reason, and the State is liable under the second cause of action for such assault and trespass on the person of claimant, and for the negligent actions of its physicians, psychiatrists and other employees. Claimant was not guilty of contributory negligence or assumed risk.
Mental suffering is presumed a consequence of physical injury in the case of an insane person as well as a sane person, unless it is proved that his condition is such that he does not experience pain. (Scolavino v. State of New York, 187 Misc. 253, mod. on other grounds 271 App. Div. 618, affd. 297 N. Y. 460.) There is no proof to the contrary in this claim and this principle would likewise apply to a mentally ill person.
In addition to the pain and suffering referred to herein, there is another specially recognized measure of damage applicable to the type of claim set forth in both the first and second causes of action. It consists of increasing the real injury by the indignity, additional mental anguish, public disgrace, loss of reputation, injured feelings, wounded pride and humiliation. It is natural to suppose that the shock to claimant’s feelings is proportioned to the sacred regard which she has for her personal virtue and chastity, her reputation, conduct, habits and moral sensibilities. (1 Clark on New York Law of Damages, § 360; Ford v. Jones, 62 Barb. 484; Gulerette v. McKinley, 27 Hun 320; Brisack v. King, 199 App. Div. 213; Johnson v. Jenkins, 24 N. Y. 252.) These considerations are given to claimant as prior to her mental illness, and as of such period the evidence shows nothing detrimental to claimant’s morals or habits.
The court is awarding compensatory damages only. The State is not subject to punitive damages, but on the other hand, cannot benefit from such award.
Claimant is entitled to an award in the first cause of action in the sum of $5,000, and in the second cause of action in the sum of $10,000, making a total award of $15,000.
The foregoing constitutes the written and signed decision of this court upon which judgment may be entered. (Civ. Prac. Act, § 440.)
Judgment is directed accordingly.